## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **NICOLE DICKENS, HALEH ALLAHVERDI, HALEY BURGESS, JILLIAN BLENIS, and LILI MITCHELL**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THINX INC.,<br><br>Defendant. | CASE NO. 1:22-cv-04286-JMF<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Nicole Dickens, Haleh Allahverdi, Haley Burgess, Jillian Blenis, and Lili Mitchell ("Plaintiffs") bring this Consolidated Class Action Complaint against Defendant Thinx Inc. ("Defendant" or "Thinx"), individually and on behalf of all others similarly situated, and complain and allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## NATURE OF THE CASE

1.      This is a civil class action brought by Plaintiffs on behalf of consumers who purchased  Thinx underwear, including the Cotton Brief, Cotton Bikini, Cotton Thong, Sport, Hiphugger, Hi-Waist, Boyshort, French Cut, Cheeky, and Thong styles ("Thinx Underwear"[1]), which are used for personal hygiene purposes to collect and/or absorb menstrual fluid. Plaintiffs seek damages and equitable remedies for themselves, and for the putative Class.

2.      Defendant designs, formulates, manufactures, markets, advertises, distributes, and sells the Thinx Underwear to consumers throughout the United States, including in the State of New York. Defendant's products are sold online on its website, as well as at various online and brick-and-mortar retailers.

3.      Consumers, including Plaintiffs, willingly pay a premium for this personal hygiene product compared to cheaper disposable alternatives such as tampons. This is because consumers, including Plaintiffs, would like an easier, safer, and more sustainable approach to feminine hygiene care as compared to traditional single-use feminine hygiene products.

---

[1] The design, manufacture, and materials of the Cotton Brief, Cotton Bikini, Cotton Thong, Sport, Hiphugger, Hi-Waist, Boyshort, French Cut, Cheeky, and Thong Underwear are substantially similar, if not identical.

4.      Through its uniform, widespread, nationwide advertising campaign, Defendant has led consumers to believe that Thinx Underwear is a safe, healthy and sustainable choice for women, and that it is free of harmful chemicals.

5.      In reality, Thinx Underwear contains harmful chemicals, including multiple polyfluoroalkyl substances ("PFAS") and silver nanoparticles, which are a safety hazard to the female body and the environment.

6.      Plaintiffs' independent testing has confirmed the existence of these harmful chemicals in Thinx's products using industry standard testing. The presence of these chemicals contradicts all of Thinx's unvarying representations that the product is nontoxic, harmless, sustainable, organic, environmentally friendly, and otherwise safe for women and the environment.

7.      Thinx has knowingly and willfully concealed and misrepresented the true nature of Thinx Underwear to consumers by engaging in, *inter alia*, the following actions, as set out more fully herein:

      a.   Representing that Thinx underwear is a safe and healthy choice for menstrual protection;

      b.   Representing that Thinx Underwear is free of harmful chemicals;

      c.   Concealing the true nature of the chemicals in Thinx Underwear;

      d.   Misrepresenting and/or concealing the results of third-party testing;

      e.   Holding out Thinx Underwear as having qualities and/or certifications that it does not possess;

      f.   Concealing the true nature of the "anti-odor" technology it uses in Thinx Underwear;

      g.   Representing that Thinx Underwear is free of toxic metals and/or nanoparticles;

      h.   Representing that its cotton Thinx Underwear is organic; and

      i.   Representing that Thinx Underwear is "sustainable," despite the presence of chemicals which are known to be harmful to the environment.

8.     Thinx's misbranding is intentional, and it renders the Thinx Underwear worthless or less valuable. If Thinx had disclosed to Plaintiffs and putative Class Members that Thinx Underwear contained harmful chemicals, such as PFAS, Plaintiffs and putative Class Members would not have purchased the Underwear or they would have paid less for the Underwear.

9.     As a result of Thinx's misconduct and misrepresentations, Plaintiffs and putative Class Members have suffered injury in fact, including economic damages.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more putative Class Members; (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs; and (iii) there is minimal diversity because Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Defendant because it is headquartered in this District, has substantial aggregate contacts with this District, including engaging in conduct that has a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, and purposely availed itself of the laws of the United States and the State of New York.

12.     In accordance with 28 U.S.C. § 1391, venue is proper in this District because Defendant is headquartered in this District, a substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District, Defendant transacts business in this District, and Defendant has intentionally availed itself of the laws and markets within this District.

## PARTIES

13.     Plaintiff Nicole Dickens is a citizen of Florida residing in Okeechobee, Okeechobee County.

5

14.     Plaintiff Haleh Allahverdi is a citizen of California residing in San Fernando, Los Angeles County.

15.     Plaintiff Haley Burgess is a citizen of California residing in San Francisco, San Francisco County.

16.     Plaintiff Jillian Blenis is a citizen of Massachusetts residing in Boston, Suffolk County.

17.     Plaintiff Lili Mitchell is a citizen of Massachusetts residing in Peabody, Essex County.

18.     Defendant Thinx, Inc. is incorporated in Delaware with its principal place of business in New York, New York.

## FACTUAL ALLEGATIONS

19.     Every day, around the world, some 800 million women and girls menstruate.[2]

20.     Throughout history, women have required products to hygienically manage their menstruation. Until very recently, commercially available feminine hygiene products in the United States were limited to disposable tampons and pads.

21.     Health concerns about feminine hygiene products date back to the 1980s, when tampons were first linked to toxic shock syndrome, a potentially life-threatening condition.[3]

22.     Currently, there is significant public health concern about the chemicals used in feminine hygiene products.[4] Potential negative health effects stemming from the chemicals in tampons and pads, in addition to environmental concerns related to single-use plastics, have caused many women to seek out alternative menstrual hygiene products.

---

[2] https://www.worldbank.org/en/news/feature/2020/05/28/menstrual-hygiene-day-2020
[3] https://my.clevelandclinic.org/health/diseases/15437-toxic-shock-syndrome
[4] https://www.womensvoices.org/2018/06/05/new-tampon-testing-reveals-undisclosed-carcinogens-and-reproductive-toxins/

6

23.     Industry research shows that increased demand for alternative menstrual hygiene products has largely been driven by young women in the 18-34-year-old category who cite environmental and health concerns about traditional disposable period products.[5]

24.     According to a study conducted by the sustainability marketing firm Shelton Group, nearly 40% of women aged 18-34 have switched or are considering switching to reusable products to manage their periods. [6]  Sustainability generally refers to a concern for how the use of resources will impact the environmental, social, and economic health of future generations.[7]

**Defendant's Business**

25.     Thinx Inc., well aware of the demand for reusable menstrual hygiene products, has quickly become a leader in the alternative menstrual product market. The company was founded in 2011 with the purported mission of empowering women by providing "safe, comfortable, and sustainable options for people with periods and bladder leaks."[8]

26.     Thinx Underwear are washable, reusable underwear designed to replace pads and tampons, or to be worn with tampons and menstrual cups for extra protection. In other words, they are "underwear that absorb your period."[9] Thinx Underwear uses "signature, innovative technology" that in addition to absorbing menstrual flow also wicks moisture, controls odors, and prevents leaks.[10]

27.     Without exception, every advertisement, marketing campaign, instructional video, and public statement produced and distributed in relation to Thinx's products encourages customers to use the Thinx Underwear the same way as traditional menstrual products and/or underwear.

---

[5] https://www.nonwovens-industry.com/issues/2019-11/view_features/feminine-hygiene-manufacturers-shift-focus/
[6] *Id.*
[7] https://www.sustain.ucla.edu/what-is-sustainability/
[8] https://www.shethinx.com/pages/thinx-it-works
[9] https://www.shethinx.com/pages/thinx-faq
[10] https://www.shethinx.com/pages/thinx-it-works

28.     Thinx Inc. has been widely praised for its innovative approach to women's healthcare. From its inception, Thinx has used a candid, personal approach to connect with its customers by openly discussing menstruation and its surrounding taboos in its advertising and marketing materials. In the words of former CEO Miki Agrawal, "It's not [advertising] copy, it's just conversation."[11]

29.     Thinx products have been marketed and advertised to women across a variety of platforms, including online advertisements, Facebook and Instagram mobile video ads, television commercials, and print advertisements.

30.     Based on a statement from former CEO Maria Molland, Thinx reached approximately 19 million people with its Facebook advertising in 2019, which Ms. Molland called "integral" to increased brand awareness.[12] Thinx saw a 30% increase in traffic to its website and a 68% increase in new website visitors as a result of the ads.[13]

31.     Because Thinx is aware of growing concerns surrounding traditional single-use menstrual products, especially among younger women, it has always positioned its Thinx Underwear as a safe, effective, and sustainable alternative from an honest and trustworthy brand. A statement from their website is reproduced below:[14]

---

[11] https://www.thedrum.com/news/2016/03/07/its-not-copy-its-just-conversation-ceo-thinx-miki-agrawal-brands-clever-subway
[12] https://www.facebook.com/business/success/thinx
[13] *Id.*
[14] https://www.shethinx.com/pages/thinx-product-safety-standards

At its core, Thinx Inc. was founded to provide
safe, comfortable, and sustainable options for
people with periods and bladder leaks. Customer
safety is important to us, and so is your trust.
That's why we'll always be honest and
transparent about how our products are made.
From rigorous absorbency testing, to objective
third-party tests of our finished products, here
are all the steps we take to uphold the highest
standards of product safety.

32.     On Defendant's website, in a section titled "FAQ", the following representations

appear[15]:

**Are Thinx free of harmful chemicals?**

Absolutely! We take customer health and
safety seriously, which is why all Thinx Inc.
products are rigorously tested for harmful
chemicals, and independently certified
through STANDARD 100 by OEKO-TEX®, which
includes REACH requirements [20.HUS.04850 |
HOHENSTEIN HTTI]. We're proud to say that
third party testing has never revealed any
harmful chemical levels in Thinx Inc. products.

---

[15] https://www.shethinx.com/pages/thinx-faq. In or around May 2021, Defendant edited its
website and removed many of the representations contained herein. Based on information and
belief, Defendant edited its website in response to a lawsuit filed in the Central District of
California alleging similar claims. That case is styled *Allahverdi et. al. v. Thinx Inc.*, 2:20-cv-
10341-SSS-JPR.

**Are they really organic?**

Yes, our Organic Cotton line is made with organic cotton!

**How do Thinx control odor?**

The wicking layer of our signature period-absorbing technology has an application of non-migratory silver, commonly used in performance wear and medical devices to control odor and the spread of bacteria. "Non-migratory" means it won't come off your undies and that it only responds to bacteria *on the fabric*, not on your skin (so your vaginal microbiome stays fresh and balanced!).

33.     On its website, on a page called "Product Safety," Defendant makes the following additional claims[16]:

---

[16] https://www.shethinx.com/pages/thinx-product-safety-standards

All Thinx Inc. underwear are rigorously tested for harmful chemicals, and independently certified through STANDARD 100 by <u>OEKO-TEX®</u>, which includes <u>REACH</u> requirements [20.HUS.04850 | HOHENSTEIN HTTI]. This OEKO-TEX® certification means every component—from fabric to trim—is thoroughly tested and certified for ecological safety. Our finished products also undergo third-party testing by <u>Bureau Veritas</u>, an accredited, globally recognized facility. We're committed to third-party testing because it puts your safety first, ensuring that all results are honest and objective.

**Do Thinx Inc. products contain toxic metals or nanoparticles?**

No, Thinx Inc. products do not contain toxic metals or engineered nanoparticles. The anti-odor layer in our products is treated with Agion®, an EU regulated treatment that uses safe, non-migratory silver zeolite and silver copper zeolite. These compounds stay on the surface of the underwear and don't travel into your body.

34.     Thinx's product label indicates that it is made of several different fabrics, but does not list additional ingredients. An example of a Thinx Hiphugger underwear label is reproduced below:

11



**Plaintiffs' Testing**

35.    Plaintiffs sought independent third-party testing to determine whether Thinx Underwear contained any harmful chemicals.

36.    The method used in Plaintiffs' independent testing is the industry standard for detecting and determining whether materials, such as Thinx underwear, comply with quality and safety standards.

37.    Plaintiffs' independent testing from a third-party lab found short-chain PFAS chemicals in Thinx Underwear at material and above trace amounts. This non-conforming ingredient found within Thinx Underwear is material to Plaintiffs, customers, and potential class members.

**PFAS Chemicals**

38.    Thinx first came under scrutiny in early 2020 when reporter Jessian Choy wrote that she had sent several pairs of Thinx Underwear to Dr. Graham Peaslee, a nuclear scientist at the University of Notre Dame, for analysis. After testing, Dr. Peaslee discovered high levels of fluorine in the underwear he tested, in addition to finding the presence of copper and zinc. Based on his findings, Dr. Peaslee opined that due to the high levels of fluorine in the underwear, they

likely contained polyfluoroalkyl substances ("PFAS"). Ms. Choy reported her findings in an article in Sierra magazine, published on January 7, 2020.[17]

39.     PFAS are a category of man-made chemicals which, *inter alia*, may be used to enhance the performance of textiles and apparel.

40.     PFAS chemical treatments are typically used on textiles in order to make them water repellant and/or stain resistant, and are frequently seen in outdoor apparel.

41.     Based on information and belief, Thinx uses PFAS chemicals to enhance the performance of the Underwear, including, but not limited to, its "moisture-wicking" and "leak-resistant" qualities.

42.     While there are thousands of PFAS chemicals in existence, they are all categorized as either "long-chain" or "short-chain" based on the amount of carbon atoms they contain. Long-chain PFAS chemicals contain more than 8 carbon atoms, while any PFAS chemicals containing less than 8 carbon atoms are considered short-chain. All PFAS contain carbon-fluorine bonds—one of the strongest in nature—making them highly persistent in the environment and in human bodies.[18]

43.     Humans can be exposed to PFAS in a variety of ways, including through ingestion, inhalation, and skin absorption.[19]

44.     Long-chain PFAS chemicals have been phased out of use in the United States and Europe due to their known toxicity to humans and the environment. Long-chain PFAS chemicals are bioaccumulative, meaning they build up in the body over time. These chemicals are sometimes called "forever chemicals" and have been associated with a variety of negative health effects for humans, including cancer. Long-chain PFAS chemicals would not be expected to appear in textiles.

---

[17] *See* https://www.sierraclub.org/sierra/ask-ms-green/my-menstrual-underwear-has-toxic-chemicals-it
[18] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[19] *Id.*

45.     Short-chain PFAS chemicals are currently used in the apparel industry as a replacement for the eliminated long-chain PFAS chemicals. There are no long term studies to indicate whether short-chain PFAS chemicals are in fact safer for consumers; in fact, there are studies to suggest that they pose similar health risks to long-chain PFAS—including bioaccumulation.[20]

46.     Recently, the U.S. Department of Health and Human Services' National Toxicology Program found that short-chain PFAS have the same adverse effects as their long-chain counterparts.[21] Their 2019 study found that both long and short-chain PFAS affected the same organ systems, with the greatest impact seen in the liver and thyroid hormone.[22]

47.     A recent New York Times article discussed the effect of PFAS exposure to pregnant women and babies, explaining the effects of PFAS on metabolism and immunity: [23]

> [s]cientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.
>
> 'And while we understandably focus on highly contaminated communities,' Dr. Lanphear said, 'we can predict, based upon all the other evidence, that **there's unlikely to be any safe level.'** [Emphasis added].

48.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has recognized that exposure to high levels of PFAS may impact the immune system and reduce antibody responses to vaccines.[24] This is a significant concern given the current public health issues surrounding COVID-19.

---

[20] *See* https://cen.acs.org/environment/persistent-pollutants/Short-chain-long-chain-PFAS/97/i33
[21] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[22] https://ntp.niehs.nih.gov/whatwestudy/topics/pfas/index.html
[23] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html
[24] https://www.atsdr.cdc.gov/pfas/health-effects/index.html

49.     Furthermore, PFAS is known to migrate during laundering, meaning that clothing items which are treated with PFAS release those chemicals into waterways when they are washed.[25]

50.     "The Madrid Statement," a scientific consensus regarding the persistence and potential for harm of PFAS substances issued by the Green Science Policy Institute and signed by more than 250 scientists from 38 countries, recommended the following actions in order to mitigate future harm: (1) discontinuing use of PFAS where not essential or safer alternatives exist; (2) labeling products containing PFAS; and (3) encouraging retailers and individual consumers to avoid products containing or manufactured using PFAS whenever possible.[26]

51.     There is ample evidence that non-PFAS based chemical treatments provide comparable performance benefits for apparel. Additionally, studies have found that *significant environmental and toxicological benefits* could be achieved by switching apparel to non-fluorinated finishes without a significant reduction in garment water-repellency performance.[27]

52.     As a result of emerging health and environmental concerns regarding short-chain PFAS, many apparel companies, including North Face and Patagonia, have committed to phasing them out of their products completely.[28]

**Silver and Silver Copper Nanoparticles**

53.     Antimicrobial textile finishes first gained popularity in the early 2010s as a way to make clothing—particularly athletic clothing—odor-free. Silver and copper are the most common ingredients in antimicrobial clothing; they work by killing bacteria that causes odor.

54.     Antimicrobial clothing has decreased in popularity in recent years due to concerns associated with silver shedding from fabric and causing harm to humans and the environment.

55.     On its website, the following representation appears[29]:

---

[25] https://www2.mst.dk/Udgiv/publications/2015/04/978-87-93352-12-4.pdf
[26] https://greensciencepolicy.org/our-work/science-policy/madrid-statement/
[27] https://www.sciencedirect.com/science/article/abs/pii/S0045653517306598
[28] https://www.gq.com/story/outdoor-gear-pfas-study
[29]  https://www.shethinx.com/pages/thinx-product-safety-standards

**Do Thinx Inc. products contain toxic metals or nanoparticles?**

No, Thinx Inc. products do not contain toxic metals or engineered nanoparticles. The anti-odor layer in our products is treated with Agion®, an EU regulated treatment that uses safe, non-migratory silver zeolite and silver copper zeolite. These compounds stay on the surface of the underwear and don't travel into your body.

56.     Agion is an antimicrobial treatment which uses silver and copper nanoparticles to reduce odor in textiles.[30]

57.     Nanoparticles are small-scale substances which are undetectable to the human eye.[31] Whether they are engineered or naturally occurring, it is a nanoparticle's *size* that creates a hazard since these small particles can readily enter the human body through inhalation, ingestion, and skin absorption.[32]

58.     The mere fact that a nanoparticle is naturally occurring does not automatically render it "safer" than an engineered nanoparticle. Thus, Thinx's representation that it does not include "engineered nanoparticles" is misleading to a reasonable consumer.

59.     Furthermore, Thinx fails to disclose on the Underwear's packaging and/or label that the Underwear contains silver nanoparticles.

---

[30] https://www.sciessent.com/water-repellent-anti-odor-antimicrobial-products/agion-silver-antimicrobial/
[31] https://www.twi-global.com/technical-knowledge/faqs/what-are-nanoparticles
[32] *Id.*

60.     On its website Thinx claims that its Agion treatment is non-migratory, which means "it won't come off your undies and that it only responds to bacteria *on the fabric,* not your skin (so your vaginal microbiome stays fresh and balanced!)."[33]

61.     Silver nanoparticles present a particular risk to the female body, especially when they are present in period products.

62.     One study found that the vaginal administration of silver nanoparticles caused ultrastructural changes to the vaginal mucosa, urethra and rectum, in addition to leading to migration of silver into the bloodstream.[34]

63.     Silver can also have adverse effects on beneficial vaginal bacteria. A recent study by the Food and Drug Administration determined that silver is effective in killing lactobacillus.[35] Lactobacillus is one of the most important beneficial bacteria types in a healthy vagina. Disruption of a woman's microbial balance can lead to overgrowth of harmful bacteria resulting in bacterial vaginosis, increased risk of sexually transmitted diseases, increased risk of pregnancy complications and other similar conditions.[36]

64.     The European Chemicals Agency ("ECHA"), the European Union's chemical regulatory agency, has also expressed concern specifically about silver zeolites and silver copper zeolites due to their potential impact on human health and the environment.[37] Silver copper zeolite and silver zeolite—including those specifically manufactured by the maker of Agion-- are currently under review and awaiting a determination of whether they will be phased out of use in the EU due to these health concerns.

65.     The vagina and vulva absorb chemicals at a higher rate than other areas of the body.[38] The fabric treated with Agion is the innermost layer of the Thinx Underwear, which comes into contact with the vulvar tissue and vulvar/vaginal mucous membranes.

---

[33] https://www.shethinx.com/pages/thinx-faq
[34] https://pubmed.ncbi.nlm.nih.gov/26816649/
[35] https://www.ncbi.nlm.nih.gov/pubmed/29481051
[36] https://www.ncbi.nlm.nih.gov/pubmed/28257809
[37] https://echa.europa.eu/documents/10162/bd098d67-3754-461c-bcde-107da470d726
[38] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3948026/

66.     Silver nanoparticles are also known to migrate from treated clothing when it is laundered.[39] Because clothing, such as the Underwear, release small flecks of fabric ("lint") when laundered, silver-containing lint is released to the environment. As a result of this migration, silver nanoparticles, which are harmful to marine life, are introduced into waterways.[40]

67.     In fact, in every published study of clothing containing nanosilver, the silver has been shown to migrate, thoroughly debunking the claim of "non-migratory" silver.[41] There are no published studies showing the success of a non-migratory silver additive to clothing. Thinx's representation that its Agion treatment is non-migratory is untrue and misleading.

68.     Thinx does not reveal to consumers that Agion is an antimicrobial, or that it contains silver and silver copper nanoparticles which are known to migrate and pose a safety hazard to the female body and the environment. Thus, Thinx's representations that its Underwear does not contain harmful chemicals, toxic metals or engineered nanoparticles is inaccurate and misleading.

**Thinx Underwear Is Not Organic**

69.     Thinx represents on its website and in all of its marketing and advertising materials that its four styles of cotton underwear (hereinafter, collectively, the "Organic Cotton Underwear") is organic.[42] Plaintiffs and Class Members believed they were purchasing organic products.

70.     Additionally, the Organic Cotton Underwear's packaging and/or labeling uniformly indicates that the product is organic. An image of the Organic Cotton Bikini's tag is reproduced below:

---

[39] https://pubs.acs.org/doi/10.1021/nn502228w

[40] https://ec.europa.eu/environment/integration/research/newsalert/pdf/risk_to_aquatic_ecosystems_from_silver_nanoparticles_394na1_en.pdf

[41] https://www.womensvoices.org/nanosilver-in-period-care-products/#fn13

[42] Thinx sells the Super Cotton Brief, Cotton Brief, Cotton Bikini, and Cotton Thong, all of which are represented as being made with organic cotton. *See* https://www.shethinx.com/collections/thinx-organic-cotton (last accessed May 12, 2021)



71.     "Organic" is generally understood as meaning an agricultural product that was produced without the use of chemical fertilizers, pesticides, or other artificial agents.[43]

72.     For any agricultural product to be sold as "organic" in the United States, no matter where in the world the crop is grown, the raw fiber must have been certified to the USDA's National Organic Program's (NOP) Crop Standard. This includes fibers such as cotton, flax and hemp.[44]

73.     Global Organic Textile Standards ("GOTS") is the worldwide leading processing standard for organic fibers. GOTS provides standards for when textiles may be classified as organic, including independent certification of the entire textile supply chain.[45]

---

[43] *See* https://www.usda.gov/media/blog/2012/03/22/organic-101-what-usda-organic-label-means
[44] https://specialtyfabricsreview.com/2020/03/12/global-organic-textile-standard-gots-clarifies-organic-product-standards/
[45] https://www.global-standard.org/the-standard

74.     In March 2020, GOTS released its latest standards which specifically prohibit the use of PFAS chemicals in any stage of processing. This prohibition extends to both long-chain and short-chain PFAS chemicals.

75.     Plaintiffs' testing found PFAS within the Thinx Underwear at above trace amounts using industry standard testing.

76.     Thinx is not eligible for GOTS certification for its finished cotton Underwear because the Underwear contains PFAS.

77.     Despite the fact the Underwear is ineligible for GOTS certification, Thinx released a GOTS "Certificate of Compliance" which was issued to a company called "Ocean Lanka." Thinx's name does not appear anywhere on the certificate, nor is there any information on the certificate referencing Thinx or its Underwear.

78.     When confronted with the presence of harmful chemicals in its Underwear in January 2020, Thinx held out this certificate as its own in public statements and on its website even though it knew, or at least should have known, that the certification did not refer to the finished Thinx Underwear.[46]

79.     The inclusion of PFAS, at material and above trace amounts, renders the Thinx Underwear not organic. The Defendant never disclosed this fact to Plaintiffs and Class Members.

80.     On its website, under the Frequently Asked Questions Section, Thinx makes the following representation: "Are they really organic? Yes, our Organic cotton line is made with organic cotton!"[47]

81.     However, despite Thinx's representations, the gusset of the Organic Cotton Underwear is *not* made with organic cotton. Elsewhere on Thinx's website, they disclose the fabric content of their Organic Cotton Underwear, which is reproduced below[48]:

---

[46] https://medium.com/@thinx/how-i-know-thinx-inc-products-are-safe-1e509dde60d5
[47] https://www.shethinx.com/pages/thinx-faq
[48] https://www.shethinx.com/collections/thinx-organic-cotton/products/thinx-cotton-brief?variant=50491926407 (Of Thinx's four varieties of Organic Cotton Underwear, only the Super Cotton Brief utilizes a non-cotton gusset; the other three varieties contain an identical fabric makeup which utilizes non-organic cotton in the gusset.)

**fabric**

body 95% organic cotton, 5% elastane
gusset 95% cotton, 5% elastane; middle
breathable PUL

82.     The gusset is the innermost layer of the Underwear, and the area of the Underwear that comes into direct contact with the body—specifically the vulva, vagina, and/or rectum--during wear. A diagram from Thinx's website is reproduced below[49]:

---

[49] https://www.shethinx.com/pages/thinx-product-safety-standards



Underwear

Gusset



Gusset layers

Body

1. Moisture-wicking layer

2. Absorbent layer

3. Moisture-impermeable layer

83.     Based on Thinx's representations, reasonable consumers, including Plaintiffs, would not expect the *cotton* gusset of the Organic Cotton Underwear to be made with non-organic cotton.

84.     Consumers, including Plaintiffs, are willing to pay a premium for items labeled organic in order to avoid exposure to chemicals, especially in the most sensitive areas of the body.

85.     Further, a reasonable consumer would not expect to find *any* harmful chemicals—let alone man-made "forever chemicals" like PFAS-- in an item labeled "organic."

86.     Plaintiffs and Class Members purchased the Thinx Underwear based upon their belief that the Thinx Underwear was organic. This belief was the direct result of Thinx's specific representations on its website and other written marketing materials, including tags affixed to the products. In reality, the Thinx Underwear does not hold any independent organic certifications, nor do they conform to industry standards for organic clothing, nor do they use exclusively organic cotton in their Organic Cotton Underwear.

### Defendant's Knowledge of the Defect and Its Material Misrepresentations

87.     In response to allegations that Thinx Underwear contains harmful chemicals, Defendant's former CEO, Maria Molland, released the following statement on February 6, 2020:

> At Thinx Inc., we take customer health and product safety very seriously. As a CEO, and mother to my three-year-old daughter, I'm personally committed to ensuring our products are designed and made to be safe for people and the planet. Our products undergo the *strictest safety testing available*, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team (emphasis added).
>
> We take the recent allegations about PFAS in Thinx Inc. products very seriously. For that reason, we immediately engaged Dr. Chris Mackay, who is a toxicologist with Intertox, Inc., a leading toxicology company that has been testing and assessing the risks posed by chemical and biological agents for the last 25 years, to review Dr. Peaslee's findings.
>
> Based on this review, Dr. Mackay stated: "The testing methods Dr. Peaslee used are inappropriate and only indicate the presence of

23

elemental fluoride — not PFAS. Fluoride is a common salt that's in everyday products like toothpaste. All of us carry fluoride around in our bodies and secrete it through things like blood and sweat. The presence of fluoride doesn't mean something contains PFAS; what it does mean is that some time in the history of the sample, it came into contact with one or more of any number of products containing fluoride. On its own, it has no toxicological significance."

Thinx Inc. uses the ***most rigorous scientific methods available*** in the world to ensure safe and sustainable products (emphasis added). Our products are tested by Bureau Veritas, S.A. an international certification agency with an accredited third-party lab that is recognized and respected around the world. This testing demonstrates that Thinx Inc. products meet the globally recognized standards of OEKO-TEX and comply with REACH regulations. Our testing with Bureau Veritas confirms that ***no detectable long-chain PFAS chemicals*** are present in Thinx Inc. products (emphasis added).

We appreciate and hear the concern our customers have expressed. In the weeks since Sierra Club's reporting, we've completed further testing that goes above and beyond REACH regulations and OEKO-TEX standards. This additional third-party testing, available for download on our blog, reaffirmed that Thinx Inc. products meet and exceed global safety standards. Make no mistake, since our founding, we have made safety a pillar of our products and brand identity. We remain committed to these principles even in the face of unreliable science and misinformation.

We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same.[50]

88.   Ms. Molland's statement was designed to further mislead and confuse customers regarding the presence of harmful chemicals in Defendant's products in the following ways:

      a.   By misrepresenting the scope and nature of Thinx's safety testing;

      b.   By misrepresenting the presence of PFAS in its products; and

      c.   By providing consumers with third-party testing results which are incomplete or otherwise inaccurate.

---

[50] https://medium.com/@thinx/how-i-know-thinx-inc-products-are-safe-1e509dde60d5

89.     Despite the fact that Defendant claims to take the allegations of PFAS in Thinx products "very seriously," the third-party testing it released in response to these allegations tested only for long-chain PFAS chemicals, which are no longer present in the apparel industry at large. Defendant's third-party testing failed to test for any short-chain PFAS chemicals.

90.     As the designer and manufacturer of Thinx Underwear, Thinx knew, or at minimum should have known, that its underwear is treated with short-chain PFAS chemicals in order to enhance its performance by making it water and/or stain resistant.

91.      Thinx did not conduct any testing for short-chain PFAS chemicals (or did not disclose the results of any testing for short-chain PFAS chemicals) because it knew that any such testing would reveal the existence of these chemicals in the Thinx Underwear.

92.     Ms. Molland's statement denying the existence of "long-chain PFAS chemicals" in its products was specifically designed to deceive consumers, as the average consumer would not be aware of the existence of short-chain vs. long-chain PFAS chemicals. Thinx would have no reason to explicitly disclaim its use of "long-chain PFAS chemicals" except for the purpose of misleading a reasonable consumer into believing ***no*** PFAS chemicals were present in its products.

93.     Despite Ms. Molland's representation that Thinx uses the "strictest safety testing" available, the testing it released to the public only tested for an extremely limited range of chemicals.

94.     The reports released by Thinx also contain discrepancies which suggest they are inauthentic, incomplete, and/or fraudulent, and intended to mislead consumers. On its Technical Report No. (7420)009-0036(S)(R2), a different report number appears on pages 3-7, which contain the substantive results of the testing. A remark also appears on page 3 which states "The test report (7420)009-0036(S)(R) has been replaced with (7420)009-0036(S)(R2) to change fabric composition as per vendor request."

95.     Furthermore, Defendant has only released test results for a fraction of its products and failed to release the results of other tests which are referenced in its publicly available reports,

25

including Volatile Organic Compounds (VOC) testing, which would be of great interest and concern to consumers.

96.    Despite Ms. Molland's representation that Thinx uses the "most rigorous scientific methods available" to ensure the safety of its products, Bureau Veritas, the third-party lab Defendant employed to test its products does not specifically offer PFAS testing.[51]

97.    The apparel industry has various certifications available with regard to consumer safety. Thinx claims to be independently certified by OEKO-TEX, but based on information and belief, Thinx does not currently hold an OEKO-TEX certification.

98.    The apparel industry also has various certifications available with regard to organic fabrics. Thinx claims its underwear is made from organic cotton, but based on information and belief, Thinx does not hold *any* certification that its Underwear is organic. Furthermore, finished products containing PFAS and antimicrobials cannot be considered organic. Any reference to its products as "organic" was inaccurate and misleading to consumers.

99.    Despite requests from journalists and consumers, Defendant has refused to provide any independent testing data from prior years.[52]

100.    As described *supra*, Plaintiffs' independent testing from a third-party lab found short-chain PFAS chemicals within Thinx Underwear at material and above trace amounts. This non-conforming ingredient found within Thinx Underwear is material to Plaintiffs, customers, and potential class members.

101.    On or about May 2021, Thinx edited the "FAQs" and "Product Safety" pages of its website to remove many of the representations alleged herein, including:

    a.   "Are Thinx free of harmful chemicals? Absolutely!"

---

[51]https://www.cps.bureauveritas.com/sites/g/files/zypfnx236/files/media/document/CPS_QA_So ftline_v6_15OCT15.pdf
[52] *Id.*

b.   "'Non-migratory' [silver] means it won't come off your undies and that it only responds to bacteria *on the fabric*, not on your skin (so your vaginal microbiome stays fresh and balanced!)."

c.   "These compounds [silver nanoparticles] stay on the surface of the underwear and don't travel into your body."

102.   Based on information and belief, Defendant removed these statements in response to a complaint filed in the Central District of California on November 11, 2020, alleging substantially similar claims of misrepresentation. That case is styled *Allahverdi et. al. v. Thinx, Inc.*, Case No. 2:20-cv-10341-SSS-JPR.

103.   Through at least the filing date of this complaint, despite actual notice of the defect, Thinx is still selling the defective Underwear and concealing its true nature from consumers.

104.   Thinx also continues to claim that "health and safety are our absolute top priorities, and we manufacture our products with that in mind."[53]

105.   Had Plaintiffs and consumers known that the Thinx Underwear they purchased contained is treated with short-chain PFAS chemicals and harmful antimicrobials, and was not 100% organic, they would not have purchased the Thinx products or would have paid less for them.

**Plaintiff Dickens' Facts**

106.   In May 2016, Plaintiff Nicole Dickens purchased two pairs of the Thinx Underwear, including the Hiphugger style, from Thinx's website.

107.   Ms. Dickens first learned about Thinx products in 2016 through their online advertising, which appeared on various websites and social media platforms she visited including Facebook. After becoming familiar with the product through its advertising, Ms. Dickens also visited the Thinx website, where she then purchased the Underwear.

---

[53] https://www.shethinx.com/pages/thinx-product-safety-standards

108.    At that time, Ms. Dickens purchased the Underwear simply because was seeking an easy, safe, reusable, and sustainable form of menstrual protection that was better for the environment than traditional disposable menstrual products.

109.    Ms. Dickens reviewed Thinx's website prior to her purchase to determine whether the Underwear contained harmful chemicals, but never saw any disclosure regarding the presence of PFAS or any other chemicals.

110.    At the time of her purchase, Ms. Dickens relied on Defendant's factual representations about the Thinx Underwear, including those representations made on Thinx's website, in its online advertising and marketing materials, and on the product's label and packaging. These representations all indicated that that the Thinx Underwear was safe for normal use and fit for the purpose of collecting and/or absorbing menstrual fluid and other vaginal discharge, that the Underwear was sustainable and safe for the environment, and that the Underwear was free from harmful chemicals.

111.    Ms. Dickens reasonably believed, based on Thinx's representations, that the Underwear would serve as a safe, healthy, environmentally-friendly and chemical-free alternative to traditional menstrual products.

112.    Nothing in Thinx's representations indicated to Ms. Dickens that the Underwear contained various chemicals known to be harmful to the female body and the environment.

113.    Ms. Dickens purchased the Underwear as a direct and intended result of Thinx's advertising, marketing, instructional videos, and other public statements, and she used them according to the product specifications.

114.    In or around November of 2020, Ms. Dickens became aware of reports, including information published by Sierra Club, that Thinx underwear contained harmful chemicals.

115.    When Ms. Dickens learned that the Thinx mislabeled its products, including failing to disclose harmful chemicals the products contained and misrepresenting that the products were organic, she stopped purchasing the Thinx Underwear.

116.    Ms. Dickens did not receive the benefit of her bargain when she purchased the Thinx Underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and to the warranties made by Defendant.  Had she been aware of the misrepresentations, she would have either not purchased the Thinx Underwear or paid substantially less for it.

117.    Ms. Dickens continues to seek out safe ways to manage her menstruation and intends to purchase menstrual underwear in the future. She would purchase Thinx Underwear again if they did not contain harmful chemicals.

118.    Ms. Dickens continues to be exposed to Thinx's advertisements on websites and social media, and continues to visit retail stores which sell Thinx's products.

**Plaintiff Haleh Allahverdi's Facts**

119.     In 2019, Plaintiff Allahverdi purchased the Thinx Underwear from a Nordstrom department store located at 21725 Victory Blvd, Canoga Park, California, 91303.

120.    Ms. Allahverdi first learned about Thinx products through their online advertising, which appeared on various websites and social media platforms she visited, and included both videos and print advertisements.

121.    At the time of her purchase, Ms. Allahverdi relied on Defendant's factual representations about the Thinx Underwear in its online advertising and marketing materials, and the product's label and packaging. These representations all indicate that that the Thinx Underwear was safe for normal use and fit for the purpose of collecting and/or absorbing menstrual fluid and other vaginal discharge. The Thinx representations also stated the cotton underwear was organic, and Ms. Allahverdi relied upon that representation.

122.    As a direct and intended result of Thinx's advertising, marketing, instructional videos, and other public statements, Ms. Allahverdi purchased several varieties of Thinx

underwear, including the Thinx organic cotton brief, which she used according the product specifications.

123.    In or around August of 2020, Ms. Allahverdi also became aware of reports, including information published by Sierra Club, that Thinx underwear contained harmful chemicals.

124.    When Plaintiff Allahverdi learned that the Defendant mislabeled its products, including failing to disclose harmful chemicals the products contained, she stopped purchasing the Thinx Underwear.

125.    Ms. Allahverdi did not receive the benefit of her bargain when she purchased the Thinx Underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and to the warranties made by Defendant.  Had she been aware of the misrepresentations, she would have either not purchased the Thinx Underwear or paid substantially less for it.

**Plaintiff Haley Burgess' Facts**

126.    In May of 2020, Plaintiff Haley Burgess purchased Thinx Sport Underwear from Amazon.

127.    At the time of Ms. Burgess' purchase, Thinx was on public notice of the harmful chemicals in its product, and had further misrepresented the safety of its Underwear.

128.    Ms. Burgess purchased Thinx underwear because she was actively seeking an eco-friendly and chemical-free alternative to traditional feminine hygiene products.

129.    Ms. Burgess viewed Thinx's website, where she sought out information regarding the product's ingredients and certifications.

130.    In making her purchase, Ms. Burgess specifically relied on Thinx's representations on its website that the product was safe, free of harmful chemicals, and certified for ecological safety. Ms. Burgess also relied on Thinx's representations that the products were OEKO-TEX

certified, as she was already familiar with this certification. The Thinx representations also stated the product was organic and Ms. Burgess relied upon that representation.

131.    When Ms. Burgess learned in 2021 that Thinx's products contained harmful chemicals, she stopped purchasing the underwear.

132.    Ms. Burgess did not receive the benefit of her bargain when she purchased the Thinx underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and warranties made by Defendant.

133.    Had she been aware of the misrepresentations regarding chemicals present in the underwear, Ms. Burgess would not have purchased the Thinx underwear or would have paid less for them.

**Plaintiff Jillian Blenis's Facts**

134.    In March 2020, Plaintiff Blenis purchased two pairs of the Thinx Underwear, including the Organic Cotton Bikini and the Hiphugger, from Thinx's website.

135.    Ms. Blenis first learned about Thinx products in 2016 through their online advertising, which appeared on various websites and social media platforms she visited. After becoming familiar with the product through its advertising, Ms. Blenis also visited the Thinx website, where she first purchased the Underwear in 2016.

136.    At that time, Ms. Blenis purchased the Underwear simply because was seeking an easy, safe, reusable, and sustainable form of menstrual protection. She purchased additional pairs in 2017.

137.    In 2019, Ms. Blenis was diagnosed with endometriosis, a gynecological disorder. Based on this disorder, she was particularly concerned about chemicals which could potentially disrupt her hormones and trigger inflammation. As a result, she began to carefully look at the chemicals contained within her menstrual products so as to avoid any unnecessary exposure. At that time, she was specifically looking for products which were organic and did not need to be used internally.

31

138.    Based on her specific needs, in addition to growing concerns about environmental impact of menstrual products, Ms. Blenis decided to purchase additional pairs of Thinx Underwear.

139.    Ms. Blenis reviewed Thinx's website prior to her purchase to determine whether the Underwear contained harmful chemicals, but never saw any disclosure regarding the presence of PFAS or any other chemicals.

140.    At the time of her purchase, Ms. Blenis relied on Defendant's factual representations about the Thinx Underwear, including those representations made on Thinx's website, in its online advertising and marketing materials, and on the product's label and packaging. These representations all indicated that that the Thinx Underwear was safe for normal use and fit for the purpose of collecting and/or absorbing menstrual fluid and other vaginal discharge, that the Underwear was sustainable and safe for the environment, and that the Underwear was free from harmful chemicals.  The Thinx representations also stated the cotton underwear was organic, and Ms. Blenis relied upon that representation.

141.    Ms. Blenis reasonably believed, based on Thinx's representations, that the Underwear would serve as a safe, healthy, organic and chemical-free alternative to traditional menstrual products.

142.    Nothing in Thinx's representations indicated to Ms. Blenis that the Underwear contained various chemicals known to be harmful to the female body and the environment.

143.    Ms. Blenis understood Thinx's "organic" representation to mean that the Organic Cotton Brief was not treated with any chemicals. Furthermore, Ms. Blenis reasonably believed that *all* of the cotton used in the Underwear—including the cotton gusset—was organic.

144.    Ms. Blenis purchased the Underwear as a direct and intended result of Thinx's advertising, marketing, instructional videos, and other public statements, and she used them according to the product specifications.

145.    In or around November of 2020, Ms. Blenis became aware of reports, including information published by Sierra Club, that Thinx underwear contained harmful chemicals.

32

146.     When Ms. Blenis learned that the Thinx mislabeled its products, including failing to disclose harmful chemicals the products contained and misrepresenting that the products were organic, she stopped purchasing the Thinx Underwear.

147.     Ms. Blenis did not receive the benefit of her bargain when she purchased the Thinx Underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and to the warranties made by Defendant.  Had she been aware of the misrepresentations, she would have either not purchased the Thinx Underwear or paid substantially less for it.

**Plaintiff Lili Mitchell's Facts**

148.     In or around January 2019, Plaintiff Lili Mitchell first purchased Thinx Underwear from Thinx's website.

149.     Ms. Mitchell purchased a variety of styles, including the Organic Cotton Bikini and the Organic Cotton Thong.

150.     Ms. Mitchell purchased Thinx underwear because she was actively seeking an eco-friendly and chemical-free alternative to traditional feminine hygiene products.

151.     Ms. Mitchell was first made aware of Thinx's products after seeing its advertisements on Facebook and Instagram. She later viewed Thinx's website, where she sought out information regarding the Underwear.

152.     In making her purchase, Ms. Mitchell specifically relied on Thinx's representations on its website that the product was safe, free of harmful chemicals, and certified for ecological safety. Ms. Mitchell also relied on Thinx's representations that stated the product was organic. Ms. Mitchell reasonably believed that all of the cotton used in the Organic Cotton Bikini and Organic Cotton Thong Underwear was organic.

153.     After wearing the Underwear regularly, Ms. Mitchell experienced multiple infections, including bacterial vaginosis, a type of vaginal inflammation caused by the overgrowth

of bacteria naturally found in the vagina. Bacterial vaginosis can occur when the vagina's levels of lactobacilli are too low, causing other bacteria to grow.[54]

154.   Silver nanoparticles, like that contained within the Underwear, are known to disrupt lactobacilli in the vagina.[55]

155.   Nowhere on the Underwear's label or packaging did Thinx disclose the presence of silver nanoparticles in its Underwear.

156.   In late 2020, Ms. Mitchell saw media reports, including those published by Sierra Magazine, that Thinx's products contained harmful chemicals. At that time, she stopped purchasing the Underwear.

157.   Ms. Mitchell did not receive the benefit of her bargain when she purchased the Thinx Underwear products that failed to conform to Thinx's material representations, including by containing ingredients that did not conform to the representations and warranties made by Defendant, including warranties that the product was safe, sustainable, organic, and free of harmful chemicals.

158.   Had she been aware of the misrepresentations regarding chemicals present in the Underwear, Ms. Mitchell would not have purchased the Thinx underwear or would have paid less for them.

**Thinx's Misrepresentations and Omissions are Material To Reasonable Consumers**

159.   Defendant's Thinx Underwear is a niche product that is directed at a specific group of consumers: women who are hoping to purchase a safe, environmentally sustainable, and economical alternative to feminine hygiene products.

160.   The representations made by Thinx were made to cater to this niche consumer group and drive consumer sales.

---

[54] https://www.medicalnewstoday.com/articles/184622#causes
[55] https://www.ncbi.nlm.nih.gov/pubmed/29481051

161.    Plaintiffs and Class Members, purchased the Thinx product because of its specific representations: that it did not contain "harmful chemicals", was organic, and did not contain heavy metals or nanoparticles. Each of these representations were important to a reasonable consumer, such as Plaintiffs and Class Members, when purchasing the Thinx Underwear.

162.    As a direct and proximate result of Defendant's advertising, marketing, and public statements, consumers, including Plaintiffs, purchased Thinx Underwear for their personal use.

163.    Contrary to representations made by Defendant in marketing materials, advertisements, social media and instructional videos on its website, Thinx Underwear contains chemicals which are harmful to the female body and the environment.

164.    Contrary to representations made by Defendant in marketing materials, advertisements, social media, and its website, the Thinx Underwear are not organic.

165.    Contrary to representations made by Defendant in marketing materials, advertisements, social media and instructional videos on its website, Thinx Underwear contains toxic metals and nanoparticles which are harmful to the female body and the environment.

166.    Plaintiff Mitchell has experienced physical symptoms including bacterial vaginosis, an infection which has been linked to ingredients which were present in the Thinx Underwear and that Thinx failed to disclose.

167.    Defendant knew or should have known of these dangers and has undertaken a deliberate and willful pattern of  conduct (including taking active measures) aimed at deceiving consumers, including Plaintiffs, to believe that Thinx Underwear are free of chemicals shown to cause adverse health outcomes.

168.    At all relevant times, Defendant knew the true nature of the chemicals contained in Thinx Underwear, but nevertheless marketed, advertised, and sold Thinx Underwear for use without adequately warning consumers that they contain chemicals that are dangerous and could be damaging to the user's health.

169.    Even after being alerted to the presence of harmful chemicals in its products in early 2020, Defendant continued to willfully conceal this information from consumers and otherwise

affirmatively deceive consumers by representing that its products had been independently certified as being free from harmful chemicals.

170.    As a direct and proximate result of Defendant's concealment of the presence of chemicals, its deceptive representations, and its failure to sufficiently warn consumers about it or its harmful consequences prior to their purchase, Plaintiffs and other similarly situated consumers purchased and used Defendant's Thinx Underwear to their detriment.

171.    Plaintiffs and Class Members were unaware of the harmful chemicals at the time they purchased Thinx Underwear. Had Plaintiffs and Class Members known the Thinx Underwear contained harmful chemicals or was not organic, they would not have purchased the Thinx Underwear or would have paid substantially less for it.

172.    Plaintiffs and all putative Class Members purchased Thinx Underwear which contained the same chemicals at the point of sale to the public.

173.    Plaintiffs and each of the Class Members have been damaged and suffered an injury in fact caused by Defendant's false, fraudulent, unfair, deceptive, and misleading practices, as set forth herein, and seek compensatory damages, injunctive relief, and such other and further relief as this Court deems just and proper.

174.    Given the massive quantities of Thinx Underwear believed to have been sold all over the country, this class action is the proper vehicle for addressing Defendant's misconduct and for attaining needed relief for those affected.

## CLASS ACTION ALLEGATIONS

175. Plaintiffs bring this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Nationwide Class:

> **During the maximum period permitted by law, all persons residing in the United States who purchased Thinx Underwear.**

176.    A nationwide class is properly certified in New York because Thinx is headquartered in New York and the majority of the conduct and facts that form the basis for Plaintiffs' claims took place in and/or emanated from the State of New York

177.    Plaintiff Dickens brings this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the members of the following Florida subclass:

> **During the maximum period permitted by law, all persons residing in the State of Florida who purchased Thinx Underwear.**

178.    Plaintiffs Allahverdi and Burgess bring this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the members of the following California subclass :

> **During the maximum period permitted by law, all persons residing in the State of California who purchased Thinx Underwear.**

179.    Plaintiffs Blenis and Mitchell bring this action individually and as representative of all those similarly situated, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the members of the following Massachusetts subclass:

> **During the maximum period permitted by law, all persons residing in the State of Massachusetts who purchased Thinx Underwear.**

180.    Specifically excluded from these definitions are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the Class

definition as necessary. Unless otherwise specifically alleged, the terms "Class" and "Class" Members" include the members of the nationwide class and state subclasses herein.

181.    <u>Numerosity</u>: The Members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class Members is presently unknown, it likely consists of at least thousands of people throughout the country. The number of Class Members can be determined by sales information and other records. Moreover, joinder of all potential Class Members is not practicable given their numbers and geographic diversity. The Class is readily identifiable from information and records in the possession of Defendant and its authorized retailers.

182.    <u>Typicality</u>: The claims of the representative Plaintiffs are typical in that Plaintiffs, like all Class Members, purchased The Thinx Underwear that were designed, manufactured, marketed, advertised, distributed, and sold by Defendant. Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that, *inter alia*, they have incurred or will continue to incur damage as a result of overpaying for a Product containing chemicals which make Thinx Underwear harmful to the female body and not fit for its intended use. Furthermore, the factual basis of Defendant's misconduct is common to all Class Members because Defendant has engaged in systematic fraudulent behavior that was deliberate, includes negligent misconduct, and results in the same injury to all Class Members.

183.    <u>Commonality</u>: Common questions of law and fact exist as to all Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Classes. Such common legal or factual questions include, *inter alia*:

    (a)   Whether Defendant omitted or failed to disclose material information to Plaintiffs and Class Members;

    (b)   Whether Defendant's alleged conduct violated public policy;

    (c)   Whether the claims discussed above about Thinx Underwear are true, or are misleading or reasonably likely to deceive;

(d)   Whether Defendant omitted material facts and/or failed to warn reasonable consumers regarding the known risks of using the Thinx Underwear;

(e)   Whether the representations discussed herein were material to a reasonable consumer;

(f)   Whether Defendant engaged in false or misleading advertising;

(g)   Whether Defendant breached the implied warranty of merchantability relating to Thinx Underwear;

(h)   Whether Defendant was negligent in its failure to adequately test;

(i)   Whether Defendant was negligent in its failure to warn;

(j)   Whether Defendant was negligent in its design of the Underwear;

(k)   Whether Plaintiffs and the Class are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

(l)   Whether Plaintiffs and the other Class members have been injured and the proper measure of their losses as a result of those injuries; and

(m)   Whether Plaintiffs and the other Class members are entitled to injunctive, declaratory, or other equitable relief.

184.   <u>Adequate Representation</u>: Plaintiffs will fairly and adequately protect the interests of Class Members. They have no interests antagonistic to those of Class Members. Plaintiffs retained attorneys experienced in the prosecution of class actions, including consumer product, misrepresentation, and mislabeling class actions, and Plaintiffs intend to prosecute this action vigorously.

185.   <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Defendant will continue to commit the unlawful practices alleged herein, and Plaintiffs and Class Members will remain at an unreasonable and serious safety risk as a result of the Thinx Underwear containing chemicals and being non-organic. Defendant has acted and refused to act on grounds that apply generally to the Class, such that final injunctive relief and corresponding declaratory relief is appropriate respecting the Class as a whole.

186.   <u>Predominance and Superiority</u>: Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful

conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of Class Members' individual claims, it is likely that few Class Members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

187.    Plaintiffs know of no difficulty to be encountered in the maintenance of this  action that would preclude its maintenance as a class action.

188.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class appropriate.

## FIRST CLAIM FOR RELIEF
### Breach of Express Warranty
### (Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses)

189.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class and repeats and re-alleges all previous paragraphs, as if fully included herein.

190.    Defendant manufactured, marketed, advertised, distributed, and sold the Thinx Underwear as part of their regular course of business.

191.    Defendant made affirmations of fact and promises on the Products' packaging and/or through the marketing and advertising described herein. Defendant expressly represented and warranted that, *inter alia*:

> a.  Thinx Underwear is free of harmful chemicals;
>
> b.  Thinx Underwear is free of toxic metals and/or nanoparticles;

40

    c.   Its cotton Thinx Underwear is organic;

    d.   Its Thinx Underwear is "sustainable," despite the presence of chemicals which are known to be harmful to the environment; and

    e.   Thinx is a safe and healthy way for women to manage their menstruation.

192.    Defendant made the foregoing express representations and warranties to all consumers, which became the basis of the bargain between Plaintiffs and the Class and Defendant.

193.    Plaintiffs and the Class Members purchased the Thinx Underwear directly from Defendant or through authorized retailers.

194.    Defendant breached the foregoing express warranties by placing the Thinx Underwear into the stream of commerce and selling them to consumers, when the Thinx Underwear contain harmful chemicals, heavy metals and/or nanoparticles; are not organic; and otherwise fail to contain the properties they were represented to possess. The presence of harmful chemicals rendered the Thinx Underwear unfit for their intended use and purpose and substantially impaired the use and value of the Thinx Underwear.

195.    As manufacturer, marketer, advertiser, distributer and seller of the Thinx Underwear, Defendant is the only party with knowledge and notice of the fact that the Thinx Underwear contains harmful chemicals.

196.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's breaches of warranties because they would not have purchased the Thinx Underwear if the true facts had been known. Specifically, Plaintiffs and Class Members have suffered economic damages in connection with the purchase of the Thinx Underwear.

197.    Defendant was put on constructive notice about its breach by at least January 2020 as the result of media reports described herein, and, upon information and belief, through its own product testing.

198.    Despite having notice and knowledge of the defect, Defendant failed to provide any relief to Class Members, failed to provide a non-defective replacement, and otherwise failed to offer any appropriate compensation from the resulting damages.

199.     As a direct and proximate result of Defendant's breach of its express warranties, Plaintiffs and Class Members did not receive the benefit of the bargain and suffered damages at the point of sale stemming from their overpayment for the defective Underwear, in addition to loss of the product and its intended benefits.

200.     Plaintiffs and Class Members are therefore entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and all such other relief deemed appropriate, for an amount to compensate them for not receiving the benefit of their bargain.

## SECOND CLAIM FOR RELIEF
### Breach of Implied Warranties
### (Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses)

201.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class and repeat and re-allege all previous paragraphs, as if fully included herein.

202.     As described above, Plaintiffs have standing to pursue this claim because they have suffered injury-in-fact and have lost money or property as a result of Defendant's conduct.

203.     Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of Thinx Underwear. Defendant knew or had reason to know of the specific use for which the Thinx Underwear was purchased, including that the Thinx Underwear was marketed, advertised, and sold as a replacement and/or supplement to traditional feminine hygiene products like pads and tampons that were "free of dangerous chemicals" and environmentally sustainable. Further, Defendant sold the cotton Thinx Underwear as an organic product.

204.     By placing Thinx Underwear into the stream of commerce, Defendant provided Plaintiffs and Class Members with implied warranties that the Thinx Underwear were merchantable and fit for the ordinary purposes for which they were sold.

205.     However, Thinx Underwear are not fit for its ordinary purpose of being used as a menstrual products that is "free of harmful chemicals" and "sustainable" because, inter alia, the

Thinx Underwear contained PFAS, a chemical known to be dangerous to humans and the environment and which renders the products not organic and unsuitable for its intended use.

206.    The inclusion of the PFAS within the Thinx Underwear render the Thinx Underwear unsuitable to be labeled as an organic product, as does the presence of non-organic cotton in the Underwear's gusset, and hence, makes the Thinx Underwear not suitable for normal use for that purpose.

207.    The problems associated with the chemicals in the materials, such as increased exposure to toxic PFAS chemicals, nanosilver, and antimicrobials, prevent the Thinx Underwear from being safely used for their intended purpose, and thus constitutes a breach of the implied warranty of merchantability. These problems are caused by Defendant's failure to adequately warn Plaintiffs and consumers of the chemicals and that Thinx Underwear is not safe to use as a menstrual products without significant exposure to toxic chemicals and risk of resulting injury.

208.    That the Thinx Underwear contained chemicals and was non-organic was not discoverable by Plaintiffs and Class Members at the time that they purchased Thinx Underwear;

209.    Defendant impliedly warranted that Thinx Underwear were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that Thinx Underwear manufactured, supplied, distributed, and/or sold by Defendant was safe and reliable for use as a menstrual products and (ii) a warranty that Thinx Underwear would be fit for its intended use.

210.    Contrary to the applicable implied warranties, Thinx Underwear, at the time of sale and thereafter, was not fit for its ordinary and intended purpose of providing Plaintiffs and Class Members with a safe menstrual product. Instead, Thinx Underwear contain harmful chemicals, are not organic, and not suitable for use as a safe menstrual product, as alleged herein.

211.    Defendant's actions, as complained of herein, breached the implied warranties that Thinx Underwear were of merchantable quality and fit for such use.

212.    Defendant's intended beneficiaries of these implied warranties were ultimately Plaintiffs and the Class, not third-party retailers, resellers or distributors who sold Thinx

Underwear. Moreover, Defendant exercises substantial control over which outlets can carry and sell its Product, which are the same places that Plaintiffs and Class Members purchased Think Underwear. In addition, Defendant's warranties are in no way designed to apply to the third-party retailers, resellers or distributors who purchase Thinx Underwear in bulk and then sell them on an individual basis to consumers. Individual consumers are the ones who ultimately review the labels prior to making any purchasing decisions. Accordingly, these warranties are specifically designed to benefit the individual consumers who purchased Thinx Underwear.

213.    Plaintiffs and Class Members sustained damages as a direct and proximate result of Defendant's breaches in that they paid a premium for Thinx Underwear that they would not have otherwise paid. Plaintiffs and the Class also did not receive the value of Thinx Underwear they paid for—Thinx Underwear are worthless or worth far less than Defendant represents due to the presence of chemicals and that they are not organic.

214.    Plaintiffs and the Class have sustained, are sustaining, and will sustain damages if Defendant continues to engage in such deceptive, unfair, and unreasonable conduct.

215.    As a result of the breach of the implied warranty of merchantability, Plaintiffs and Class Members are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.


**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses)**

216.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class, and repeat and re-allege all previous paragraphs, as if fully included herein.

217.    Plaintiffs and Class Members conferred a monetary benefit on Defendant, and Defendant had knowledge of this benefit. The retail price for Thinx Underwear listed online is $24.00 or more.

218.    By its wrongful acts and omissions described herein, including selling the Thinx Underwear with chemicals and that were not organic, Defendant was unjustly enriched at the expense of Plaintiffs and Class Members.

219.    Plaintiffs and Class Members' detriment and Defendant's enrichment were related to and flowed from the wrongful conduct alleged herein.

220.    Defendant has profited from its unlawful, unfair, misleading, and deceptive practices at the expense of Plaintiffs and Class Members under circumstances in which it would be inequitable for Defendant to retain the profits, benefits, and other compensation obtained from its wrongful conduct as described herein in connection with selling the Thinx Underwear.

221.    Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's unjust enrichment because they would not have purchased Thinx Underwear on the same terms or for the same price had they known that the Thinx Underwear contained harmful chemicals and were not organic.

222.    Defendant either knew or should have known that payments rendered by Plaintiffs and Class Members were given and received with the expectation that the Thinx Underwear were free of chemicals, were organic, and capable of providing the benefits represented by Defendant in the labeling, marketing, and advertising of Thinx Underwear. It is inequitable for Defendant to retain the benefit of payments under these circumstances.

223.    When required, Plaintiffs and Class Members are in privity with Defendant because Defendant's sale of Thinx Underwear was either direct or through authorized third-party retailers and resellers. Purchase through authorized retailer and resellers is sufficient to create such privity because such authorized third parties are Defendant's agents for the purpose of the sale of Thinx Underwear.

224.    As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and Class Members are entitled to restitution of, disgorgement of, and/or imposition of a constructive trust upon all profits, benefits, and other compensation obtained by Defendant for its inequitable and unlawful conduct.

## FOURTH CLAIM FOR RELIEF
### Negligent Misrepresentation
**(Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses)**

225.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class and repeats and re-alleges all previous paragraphs, as if fully included herein.

226.    As discussed above, Defendant represented to Plaintiffs and Class Members that Thinx was free of harmful chemicals, despite the fact that Thinx Underwear contained PFAS chemicals and nanosilver particles, which are known to cause harm to humans and the environment, in above-trace amounts. Defendant further represented that the Thinx Underwear was organic, despite the presence of these chemicals. Defendant had a duty to disclose this information.

227.    At the time Defendant made these representations, Defendant knew or should have known that these representations were false or otherwise made them without knowledge of their truth or veracity.

228.    At an absolute minimum, Defendant negligently misrepresented and/or negligently omitted material facts about the Thinx Underwear.

229.    The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class Members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class Members to purchase the Thinx Underwear.

230.    Plaintiffs and Class Members would not have purchased the Thinx Underwear if the true facts had been known.

231.    The negligent actions of Defendant caused damage to Plaintiffs and Class Members, who are entitled to damages and other legal and equitable relief as a result.

## FIFTH CLAIM FOR RELIEF
### Fraud
**(Plaintiffs Individually and on Behalf of the Nationwide Class and State Subclasses)**

46

232.    Plaintiffs bring this claim individually and on behalf of the members of the Nationwide Class and repeats and re-alleges all previous paragraphs, as if fully included herein.

233.    As discussed above, Defendant provided Plaintiffs and Class Members with false or misleading material information and failed to disclose material facts about the Thinx Underwear, including but not limited to the fact that it contains PFAS chemicals which are known to cause harm to humans and the environment, in direct contradiction to Defendant's uniform marketing of the Thinx Underwear as safe, sustainable, and "free from harmful chemicals." These misrepresentations and omissions were made with knowledge of their falsehood.

234.    The misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class Members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class Members to purchase Thinx Underwear.

235.    The fraudulent actions of Defendant caused damage to Plaintiffs and Class Members, who are entitled to damages and other legal and equitable relief as a result.

236.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling Thinx Underwear to Plaintiffs and the Class. At all relevant times, it was reasonably foreseeable by Defendant that the use of Thinx Underwear in its intended manner involved a substantial risk of injury and was unreasonably dangerous to Plaintiffs and the Class as the ultimate users of Thinx.

237.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that Thinx Underwear posed to Plaintiffs and Class Members, as the harmful condition of the Thinx Underwear existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

238.    Defendant, as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of Thinx Underwear, had a duty to warn Plaintiffs and the Class of all dangers associated with the intended use of Thinx Underwear.

47

239.     At minimum, the duty arose for Defendant to warn consumers that use of Thinx Underwear could result in injury and become unreasonably dangerous.

240.     Defendant was negligent and breached its duty of care by negligently failing to provide adequate warnings to purchasers and users of Thinx Underwear, including Plaintiffs and the Class, regarding the risks and potential dangers of Thinx Underwear.

241.     Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Thinx Underwear contains materials and chemicals known to cause adverse health effects in humans and in the environment.

242.     Defendant knew, or through the exercise of reasonable care, should have known of the harmful condition and dangers associated with using Thinx Underwear as described herein, and knew that Plaintiffs and Class Members could not reasonably be aware of those risks. Defendant failed to exercise reasonable care in providing Plaintiffs and the Class with adequate warnings.

243.     As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of Thinx Underwear, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.

244.     As Defendant's conduct was grossly negligent, reckless, willful, wanton, intentional, fraudulent, or the like, Plaintiffs and Class Members are entitled to an award of punitive damages against Defendant.


**SIXTH CLAIM FOR RELIEF**
**Violations of the Florida Deceptive and Unfair Practices Act ("FDUTPA")**
**Florida Statutes § 501.201 *et seq.***
**(Plaintiff Dickens Individually and on Behalf of the Florida Class)**


245.     Plaintiff Dickens brings this claim individually and on behalf of the members of the Florida Class and repeats and re-alleges all previous paragraphs, as if fully included herein.

246.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201 et seq. ("FDUTPA"). The stated purpose of FDUTPA is to "protect the consuming public...from those who engage in unfair methods or competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

247.     Plaintiff Dickens and all members of the Florida Class were, at all relevant times, consumers, as defined by Fla. Stat. § 501.203(7).

248.     Defendant at all relevant times was engaged in trade or commerce as defined by by Fla. Stat. § 501.203(8).

249.     Fla. Stat. § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

250.     Defendant engaged in unfair and deceptive acts, in violation of Fla. Stat. § 501.204(1), as described herein by, inter alia, marketed, advertised and represented that the Thinx Underwear were free from harmful chemicals and nanoparticles, organic, safe, or sustainable when in fact the Thinx Underwear contain potentially harmful, unnatural, man-made PFAS chemicals.

251.     At all times relevant to this action, Defendant was aware that the Thinx Underwear contained PFAS chemicals and nanoparticles in direct contradiction to its uniform packaging, labeling, and other marketing representations.

252.     Defendant's unfair and deceptive acts were likely to deceive reasonable consumers, and in fact did deceive Plaintiff Dickens and Florida Class Members, as to the true nature of the Thinx Underwear.

253.     Defendant's practices offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

254.     Plaintiff Dickens and Florida Class Members have been aggrieved by Defendant's unfair and deceptive practices in that they paid for the Thinx Underwear which they would not have

purchased, or would have paid less for, but for Defendant's deceptive, misleading, and unfair practices as described more fully herein.

255.    The damages suffered by Plaintiff Dickens and Florida Class Members were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as described in this Complaint.

256.    Pursuant to Fla. Stat. § 501.211(1), Plaintiff Dickens and Florida Class Members seek a declaratory judgment and court order enjoining the above-described wrongful acts and practices of Defendant, and for restitution and disgorgement.

257.    Additionally, pursuant to Fla. Stat. §§ 501.211(2) and 501.2105, Plaintiff Dickens and Florida Class Members make claims for damages, attorneys' fees, and costs.

<strong><u>SEVENTH CLAIM FOR RELIEF</u></strong><br>
<strong>Violation of the California False Advertising Law ("FAL")</strong><br>
<strong>California Business and Professions Code §§ 17500, <em>et seq.</em></strong><br>
<strong>(Plaintiffs Allahverdi and Burgess Individually and on Behalf of the California Class)</strong>

258.    Plaintiffs Allahverdi and Burgess bring this count on behalf of themselves and the California Subclass and repeat and re-allege all previous paragraphs, as if fully included herein.

259.    The conduct described herein took place within the State of California and constitutes deceptive or false advertising in violation of California Business and Professions Code § 17500.

260.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

261.    It also is unlawful under the FAL to make or disseminate any advertisement that is "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id.

50

262.     Defendant, when it marketed, advertised and sold Thinx, represented to Plaintiffs Allahverdi and Burgess and California Class Members that Thinx was free of chemicals and safe, despite the fact that Thinx Underwear contained harmful chemicals in above-trace amounts and was not safe.

263.     Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

264.     At the time of its misrepresentations, Defendant was either aware that Thinx contained chemicals, was not safe, and not organic, or was aware that it lacked the information and/or knowledge required to make such a representation truthfully. Defendant concealed and omitted and failed to disclose this information to Plaintiffs Allahverdi and Burgess and California Class Members.

265.     Defendant's descriptions of Thinx Underwear were false, misleading, and likely to deceive Plaintiffs and other reasonable consumers.

266.     Defendant's conduct therefore constitutes deceptive or misleading advertising.

267.     Plaintiffs Allahverdi and Burgess have standing to pursue claims under the FAL as they reviewed and relied on Defendant's packaging, advertising, representations, and marketing materials regarding Thinx Underwear when selecting and purchasing Thinx Underwear.

268.     In reliance on the statements made in Defendant's advertising and marketing materials and Defendant's omissions and concealment of material facts regarding the quality and use of Thinx Underwear, Plaintiffs Allahverdi and Burgess and California Class Members purchased Thinx Underwear.

269.     Had Defendant disclosed the true nature of Thinx Underwear (that it contains chemicals and is not organic), Plaintiffs Allahverdi and Burgess and California Class Members would not have purchased Thinx Underwear or would have paid substantially less for it.

270.     As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and/or profits, including but not limited to money from

Plaintiffs Allahverdi and Burgess and California Class Members who paid for the Thinx Underwear, which contained chemicals and were not organic.

271.   Plaintiffs Allahverdi and Burgess and California Class Members seek restitution and disgorgement of any monies wrongfully acquired or retained by Defendant and by means of its deceptive or misleading representations, including monies already obtained from Plaintiffs and California Class Members as provided for by the California Business and Professions Code § 17500.

## EIGHTH CLAIM FOR RELIEF
**Violation of the California Consumer Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.***
**(Plaintiffs Allahverdi and Burgess Individually and on Behalf of the California Class)**

272.   Plaintiffs Allahverdi and Burgess bring this count on behalf of themselves and the California Subclass and repeat and re-alleges all previous paragraphs, as if fully included herein.

273.   The conduct described herein took place in the State of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, et seq.

274.   The CLRA applies to all claims of all California Class Members because the conduct which constitutes violations of the CLRA by Defendant occurred within the State of California.

275.   Plaintiffs Allahverdi and Burgess and California Class Members are "consumers" as defined by Civil Code § 1761(d).

276.   Defendant is a "person" as defined by Civil Code § 1761(c).

277.   Thinx qualifies as "goods" as defined by Civil Code § 1761(a).

278.   Plaintiffs Allahverdi and Burgess and the California Class Members' purchases of Thinx Underwear are "transactions" as defined by Civil Code 25 § 1761(e).

279.     As set forth below, the CLRA deems the following unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which does result in the sale or lease of goods or services to any consumer as unlawful.

(a)     "Representing that goods … have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have." Civil Code § 1770(a)(5); and

(b)     "Representing that goods … are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Civil Code § 1770(a)(7).

280.     Defendant engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5) and (a)(7) when it represented, through its advertising and other express representations, that Thinx Underwear had benefits or characteristics that it did not actually have.

281.     As detailed in the body of this Complaint, Defendant has repeatedly engaged in conduct deemed a violation of the CLRA, and has made representations regarding Thinx Underwear's benefits or characteristics that it did not in fact have, and represented Thinx Underwear to be of a quality that was not true. Indeed, Defendant concealed this information from Plaintiffs Allahverdi and Burgess and California Class Members.

282.     Thinx Underwear was not and is not "reliable," in that it is not safe and is of inferior quality and trustworthiness compared to other products in the industry. As detailed above, Defendant further violated the CLRA when it falsely represented that Thinx Underwear meets a certain standard or quality.

283.     As detailed above, Defendant violated the CLRA when it advertised the Thinx Underwear with the intent not to sell Thinx Underwear as advertised and knew that the Thinx Underwear was not as represented.

284.     Specifically, Defendant marketed and represented the Thinx Underwear as being free of harmful chemicals, when in fact the Underwear contains PFAS and silver and silver copper nanoparticles.

285.    Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

286.    Defendant's deceptive practices were specifically designed to induce Plaintiffs Allahverdi and Burgess and California Class Members to purchase or otherwise acquire Thinx Underwear.

287.    Defendant engaged in uniform marketing efforts to reach California Class Members, their agents, and/or third parties upon whom they relied, to persuade them to purchase and use Thinx manufactured by Defendant. Defendant's packaging, advertising, marketing, website and retailer product identification and specifications, contain numerous false and misleading statements regarding the quality, safety, and reliability of Thinx. These include, inter alia, the following misrepresentations contained in its advertising, marketing, social media platforms, and website:

- "At its core, Thinx Inc. was founded to provide safe, comfortable, and sustainable options for people with periods and bladder leaks."

- "Customer safety is important to us, and so is your trust. That's why we'll always be honest and transparent about how our products are made."

- "All Thinx Inc. underwear are rigorously tested for harmful chemicals."

- "We're proud to say that third party testing has never revealed any harmful chemical levels in Thinx Inc. products."

- "Our products undergo the strictest safety testing available, and it was the company's deep and abiding commitment to safe and sustainable products that made me want to join the team."

- "Call me a feminist, call me an entrepreneur, call me whatever you want, but I believe in elevating humanity using conscious consumerism as the vehicle to do that."

- "We will always push for more disclosure from our manufacturers, and more rigorous industry standards for regulation and compliance — and we urge others in our category to do the same."

54

- "What does a more sustainable period look like? It just makes me feel better about my period."[56]

288.     Despite these representations, Defendant also omitted and concealed information and material facts from Plaintiffs and California Class Members.

289.     In their purchase of Thinx Underwear, Plaintiffs Allahverdi and Burgess and California Class Members relied on Defendant's representations and omissions of material facts.

290.     These business practices are misleading and/or likely to mislead consumers.

291.     On November 11, 2020, Plaintiffs provided written notice to Defendant via certified mail through the United States Postal Service demanding corrective actions pursuant to the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1770, et seq. Defendant failed to take any corrective action.

292.     In accordance with Civil Code § 1780(a), Plaintiffs and the other California Class Members seek equitable relief for Defendant's violations of the CLRA.

293.     Pursuant to California Civil Code § 1780(a)(1)-(5) and § 1780(e), Plaintiffs Allahverdi and Burgess seek a declaration that Defendant's conduct violates the Consumers Legal Remedies Act, money damages, reasonable attorneys' fees and litigation costs, and any other relief the Court deems proper under the CLRA.

### NINTH CLAIM OF ACTION
**Violations of the California Unfair Competition Law**
**("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(Plaintiffs Allahverdi and Burgess Individually and on Behalf of the California Class)**

294.     Plaintiffs Allahverdi and Burgess bring this count on behalf of themselves and the California Subclass and repeat and re-allege all previous paragraphs, as if fully included herein.

295.     Defendant is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

296.     Plaintiffs Allahverdi and Burgess and Class Members who purchased Defendant's the Thinx Underwear suffered an injury by virtue of buying products in which Defendant

---

[56]

misrepresented and/or omitted Thinx Underwear's true quality, reliability, safety, and use. Had Plaintiffs Allahverdi and Burgess and Class Members known that Defendant materially misrepresented Thinx Underwear and/or omitted material information regarding its Thinx Underwear and its safety, they would not have purchased Thinx.

297.    Defendant's conduct, as alleged herein, violates the laws and public policies of California and the federal government, as set out in the preceding paragraphs of this complaint.

298.    There is no benefit to consumers or competition by allowing Defendant to deceptively label, market, and advertise its Thinx Underwear.

299.    Plaintiffs Allahverdi and Burgess and Class Members who purchased Defendant's Product had no way of reasonably knowing that Thinx Underwear was deceptively packaged, marketed, advertised, and labeled, was not safe, and unsuitable for its intended use. Thus, Plaintiffs Allahverdi and Burgess and California Class Members could not have reasonably avoided the harm they suffered.

300.    Specifically, Defendant marketed, labeled, and represented the Thinx Underwear as being free of harmful chemicals, when in fact the Underwear contains PFAS and silver and silver copper nanoparticles.

301.    Further, Defendant sold the Thinx Underwear as an organic product when the Thinx Underwear contains ingredients that render it not organic.

302.    The gravity of the harm suffered by Plaintiffs Allahverdi and Burgess and Class Members who purchased Defendant's Thinx outweighs any legitimate justification, motive or reason for packaging, marketing, advertising, and labeling the Thinx Underwear in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiffs Allahverdi and Burgess and California Class Members.

303.    The above acts of Defendant in disseminating said misleading and deceptive statements to consumers throughout the state of California, including to Plaintiffs Allahverdi and Burgess and Class Members, were and are likely to deceive reasonable consumers by obfuscating

the true nature of Defendant's Thinx Underwear, and thus were violations of Cal. Bus. & Prof. Code §§ 17500, et seq.

304.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs Allahverdi and Burgess, on behalf of herself and all others similarly situated, and as appropriate, on behalf of the general public, seeks equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court:

a.    Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.    Name Plaintiffs as Class Representatives and Plaintiffs' attorneys as Class Counsel;

c.    Award damages, including compensatory, exemplary, and statutory damages, to Plaintiffs and the Class in an amount to be determined at trial;

d.    Grant restitution to Plaintiffs and the Class and require Defendant to disgorge its ill-gotten gains;

e.    Permanently enjoin Defendant from engaging in the wrongful and unlawful conduct alleged herein;

f.    Award Plaintiffs and the Class their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

g.    Award Plaintiffs and the Class pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

h.    Award such further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

DATED: August 8, 2022.                    Respectfully submitted,


                                          */s/ Erin J. Ruben*
                                          Erin J. Ruben
                                          J. Hunter Bryson*
                                          **MILBERG COLEMAN BRYSON PHILLIPS
                                          GROSSMAN, LLP**
                                          900 W. Morgan Street
                                          Raleigh, NC 27603
                                          P.O. Box 12638
                                          Raleigh, NC 27605
                                          eruben@milberg.com
                                          hbryson@milberg.com

                                          Harper T. Segui*
                                          **MILBERG COLEMAN BRYSON PHILLIPS
                                          GROSSMAN, LLP**
                                          825 Lowcountry Blvd., Suite 101
                                          Mt. Pleasant, SC 29464
                                          hsegui@milberg.com

                                          Rachel Soffin*
                                          **MILBERG COLEMAN BRYSON PHILLIPS
                                          GROSSMAN, LLP**
                                          800 S. Gay Street, Suite 1100
                                          Knoxville, TN 37929
                                          rsoffin@milberg.com


                                          ***Attorneys for Plaintiffs and the Putative Class***

                                          *\*Pro Hac Vice Forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that today the foregoing document was filed on ECF which will send electronic notification to all attorneys registered for ECF-filing.

Dated: August 8, 2022

*/s/ Erin J. Ruben*
Erin J. Ruben
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, LLP**
900 W. Morgan Street
Raleigh, NC 27603
P.O. Box 12638
Raleigh, NC 27605
eruben@milberg.com

*Attorney for Plaintiff*

59